Good morning. May it please the Court. My name is Tom Sheridan from the firm of Stanley Conroy, Bierstein, Sheridan, Fisher & Hayes, and I represent the plaintiff appellant, Stephen Wodka, who seeks relief on behalf of the mutual fund to which he invested, and on behalf of himself and his fellow investors. With me at council table is my co-counsel, Nico Herrera, and I would like to reserve two minutes for rebuttal. As the plurality, concurring, and dissenting opinions in the Hemi case illustrate, RICO, Proxima, Cause can sometimes present challenges for the courts. I would like to suggest, if I may, that the court consider a distinction which I think is helpful, and that is the distinction between parties who are sequentially injured by a particular injury, as distinguished from causes that may sequentially result in the plaintiff's injury. Turning first to the issue of parties sequentially injured, the Holmes case presents a very good example of that. You have the defendant causing an injury to a corporation, and the injury to the corporation cause is essentially passed on injuries to others, such as creditors, or in that case the circuit. When the courts confront issues involving these passed-on injuries, the courts say, well, we don't want to go beyond the first step. Only the party directly injured should be entitled to bring the claim, and that's because if you let the passed-on injured plaintiffs sue, you'd have problems of multiple recoveries for the same wrong. You'd have problems of trying to allocate. How do you deal with the damages when the corporation sues and it's recovering for its damage? That would cause a multiple recovery if you let, for example, the shareholders sue. But in Holmes, and that's, I think, a very good example of this, the trustee who was suing on behalf of the brokerage firm that became insolvent was allowed to sue. You have the more directly injured party permitted to sue. In Hemi, you had a passed-on injury. The direct injury was suffered by the state of New York, and the secondary passed-on, indirect, if you will, injury was suffered by the city of New York. That's the sort of distinction, that's a critical distinction, that I think you'll find throughout the cases. And when you turn to the issue of multiple causes, the result is very different. When you're talking about parties, you only go one step. But when you're talking about multiple causes, the courts talk in terms of a chain of causation, links in a chain of causation. There's no such thing as a chain that just has one link. There's no such thing as an event that has only one cause. Things happen because of multiple causes. And the common law has developed a fairly straightforward set of rules for dealing with what happens when you have multiple causes. But this is RICO causation, and the Supreme Court has told us that those concepts of common law proximate cause are different from the statutory proximate cause contemplated by Congress when it provided remedies under the civil RICO statute. I do not accept, Judge, that RICO proximate cause is different. I submit that it is exactly the same. The Second Circuit didn't agree with that, did it? The Second Circuit did not agree with that. The Second Circuit applied their own rules. They applied the American Express test, which frankly has nothing to do with what I think is the Supreme Court's test in Holmes. But if you look at the history of where we got to and how we got to where we are in RICO, it started in antitrust. The court in the antitrust context said, well, what kind of direct injury do we require? And they said, well, Congress must have assumed common law proximate cause. So they incorporated common law proximate cause into antitrust. And then in the Holmes case, the court looked at it and said, well, how are we going to deal with this issue of causation? And they said, well, Congress must have assumed, because they used exactly the same language in RICO, that common law proximate cause, they say Paul's graph, the classic case of common law proximate causation and foreseeability. This court in Diaz cited Paul's graph as being the guiding principle. Let's assume we agree with you on the proximate cause question. Yes. What I'm having a hard time getting my mind around is how it can be a predicate act under RICO for a passive investor to buy shares on a publicly traded exchange where it's legal to sell those shares. That's the thing that hangs me up. The plain language of the statute prohibits ownership of all or part of an illegal gambling business. There's no question. Does that mean everybody who bought stock on the London Stock Exchange is guilty of an American crime? I don't think that the federal law would reach individual shareholders over in England who did nothing more than purchase on the London Exchange and who stayed there. Even though the company does business in the United States? I just don't think that under the court's precedence, that the United States would be able to assert jurisdiction over a purely private transaction over in England. Even if the London investor knew that the company was engaged in gambling activities in the United States and was warned that this is clearly illegal under U.S. law? Let me be precise. Why wouldn't an offshore investor under your theory be liable? I want to be very precise. If the investor bought the stock over there and stayed over there, I don't think concepts of federal jurisdiction would reach them. But if they came here and brought the stock here... to finance illegal gambling activities in the United States, why wouldn't under any other principle of aiding and abetting in criminal law, he be liable as a principle? To me, it's not a question of substantive liability. Clearly, the statute prohibits it. Clearly, it's a violation of the statute. The practical difficulty is in reaching the purely foreign conduct and whether or not the federal... So it's a personal jurisdiction concern? I think, Your Honor, it's a question of the extraterritorial application of U.S. criminal law. We apply it all the time on the high seas when somebody is trying to smuggle a mothership load of cocaine into the United States. I agree with you. I'm just responding to a practical difficulty of... If the hypothetical is an English citizen in England purchasing a share of stock on an English stock exchange, even though they know that it's... But here we have a mutual fund in the United States... Suppose five investors got together and decided to put up the money for a cocaine smuggling operation. Yes. And they knew exactly what the money was going to be used for. Would they have a civil reco cause of action under your theory if the government intercepted the shipment of cocaine and they lost their investment? Yes, I think so. Congress would be very surprised to learn that. I don't think they would be surprised. I think when racketeers commit crimes and people in the United States provide funding for that activity, I don't think Congress would be surprised by that. What about an investor in a company that engages in activities that violate the criminal environmental laws? Same answer? Again, I want to be precise. We're dealing here with a statute that specifically deals with illegal gambling. I'm not aware of a statute that says it's illegal to invest in a cocaine business or it's illegal to invest in a business that's violating environmental laws, but we have a specific statute that specifically says it's illegal to invest in all or any part of an illegal gambling business. Then why isn't your client just as culpable? Because there's a mens rea requirement, for one thing. My client was an investor in a mutual fund who didn't have any knowledge that they were investing in this. They don't have a perspective? They don't tell you what the fund had? All they do is they do give you periodic reports that list the names of the companies in which they have invested, and if you look down the list of hundreds of companies, you might see that there was one called Party Gaming, but you'd have to infer. But what we did not have and what they did have was they had the prospectus of the gambling company that specifically warned them of the illegality. Doesn't he lose title to the funds at the moment that he invests in the illegal enterprise under the forfeiture laws? That, in essence, the government now has title to the money which relates back to the time of the wrong, and therefore the government is in the best position to enforce remedies to seize assets. That's a concept that had never occurred to me, Your Honor. I don't believe that... That's why they pay me. Isn't that guesswork up there? Well, not nearly enough. Why don't you finish your answer and then we'll go ahead. No, I don't believe it. I believe that we are still the most directly injured party, in fact, the only directly injured party, and we're the only party that can be relied on to vindicate the law in this circumstance. Thanks, Mr. Chairman. Thank you. There's a note on the counter, and I can't tell who's going to argue, and the handwriting is a little hard to decipher here. Good morning, Your Honors. May it please the Court. I'm Jeffrey Moletta. I represent the defendants' causeway capital management and the individuals who are officers and directors of that. With me at the counsel table is John Spiegel. We propose to divide our argument that I would take seven minutes to address the RICO claims, and Mr. Spiegel, who represents the independent directors, would address the alternative basis we've urged on the Court for dismissal, and that is the Delaware State corporate law argument that this is purely a derivative action and the demand has not been made. Your Honor, it's our position that the district court correctly decided the case and correctly relied on the McBrady case, which was the decision of the Southern District of New York, which was affirmed by the Second Circuit. Let me ask you about that footnote. One, the Second Circuit, Memo Dispo, says, foreseeability is often the test of proximate causation in common law. RICO causation is a concept distinct from proximate causation as that term is used. It has no further explanation. What's the difference exactly? Foreseeability, Your Honor, is part of the proximate cause analysis under RICO, but it's not the only part. It's an essential part of it, but there's a direct cause element, which was added by the Holmes case and has been reiterated by the Supreme Court in the pre-decision since that time. It would have been a very simple matter for the Supreme Court to adopt foreseeability as a test in Holmes. It could have said that very simply. It could have made the law as clear as counsel says that it is, that it's just a foreseeability test, but it rejected that for reasons that it explained in Holmes. Why isn't it directly, if you invest in an illegal investment, that law enforcement action to quell it is a direct cause of that? Well, the act of owning or investing, Your Honor, causes no harm to the fund. In fact, the actions and the courts look at the purpose of the act in many cases, an intent to cause harm. There's no intent to cause harm by the act of investing. This was done by the advisor in an effort to make money for the fund and indirectly to make money for itself. There's no harm in ownership. There's no harm in the investment act. Where the harm enters into it, according to the allegations in the complaint, is through a series of intervening acts undertaken by other parties. For example, the fund makes a purchase. It makes money if the stock goes up. The reason the stock price goes down, according to the plaintiff in this case, is not because anything happened to the two companies that were involved here, Party Gaming and Ned Teller, but because the federal government, prosecutors, obtained an indictment against an executive of another company and that allegedly caused the Party Gaming and Ned Teller stocks to fall. They arrested an executive of yet another company, Betting on Sports, and again, that's alleged to have called the Party Gaming and the Ned Teller stocks to fall. And then finally, yet another party, Congress, gets into the act and at the last minute tacks on the Uniform Internet Gambling Enforcement Act to another bill which regulates the ability of companies to process payments and that is yet another act which allegedly causes the stock prices to fall. None of this is a direct action against Party Gaming. None of it is a direct action against Ned Teller. It all depends upon the acts of independent parties taking discretionary acts within their power which puts information out which causes investors in Party Gaming and Ned Teller presumably to evaluate their investment and decide whether to hold on to that stock or not. Apparently they thought, for whatever reason, to begin to sell that stock that drove the price down over time, over a period of many months. That type of very attenuated cause of the loss rather than the initial decision to make an investment and hold it is what causes the loss in this case, Your Honor. And that is far beyond the direct cause test which has been enunciated by the Supreme Court in each of its cases. And that's the basis of the Second Circuit and the Southern District dismissed essentially the same case here. In many cases, this case is an even easier case on the proximate cause issue because in the Southern District cases, at least one of the stocks involved in the government action was held in the portfolio. Here, neither of the stocks is the subject of government action. Neither company is the subject of government action. The notion that plaintiff's counsel mentioned that there was a requirement for there to be indirected, that you had sequentially injured parties, is not the test. The Supreme Court has never explained the test in those terms. It's explained the test in terms of direct cause of the harm. And indeed, you could say, he explains the Hemi case as a sequentially injured case, but it's not. The City of New York is directly injured because it cannot collect taxes that it imposes and it collects because of the alleged fraud in that case. So the sequential injury concept breaks down, I think, on that point. With respect to one of our principal arguments, which the Court has picked up on in the alternative, that there's no predicate act here because the ownership element is missing. That's the alleged basis for the 1955 violation. When you own a share of stock, you have an interest in personal property. You have an interest which is transferable as personal property. You do not own the underlying business. And the allegation here is that, and the position, I believe, of the government is that aspects of Party Gaming's business and NetTeller's business were illegal gambling operations. There are other aspects because both businesses, particularly Party Gaming, admittedly does business around the world, a high proportion in the United States, but around the world that are not illegal gambling businesses under the statute. And therefore is Party Gaming, if anyone who owns that interest, not a passive shareholder who purchases security on the London Stock Exchange? That is not what's within the intent of the statute. The government has never taken the position to our knowledge and no court has ever held that that type of passive ownership of a security is, in effect, an ownership of an illegal gambling operation. And so for that reason, that issue was urged on the court below. The court followed correctly, in our view, the McBurdey test and dismissed on that ground. But that is the failure to allege a predicate act is another alternative basis on which this case could be dismissed on the RICO theory. Unless the court has further questions, I'm going to yield the balance of my time to Mr. Spiegel. Thank you, Mr. Miller. Good morning. Good morning. May it please the court. My name is John Spiegel, among Rituals and Olson, on behalf of the independent trustees of the Causeway Management Trust. I'm here to address the alternative ground for affirmance of the dismissal below, which is the failure of the plaintiff to make demand upon my clients, the independent trustees of the trust. Now, I only represent two of the independent trustees. There are four on the five-member board. The reason I only represent two is the plaintiff only sued two of the independent trustees. The two other independent trustees weren't even on the board at the time this investment was made. So under the standards that this court has been dealing with, applying Delaware law on demand requirements and demand futility, and in the 30 years I've been appearing before this court, the court has regularly dealt with this issue in cases like Greenspan against Webb and Silicon Graphics. Applying that standard, this case clearly is a demand-required case, but it's even stronger than that. It's even stronger than that for the reasons, first of all, that the plaintiff didn't even sue all of the trustees, only two out of the five. How many derivative cases do you see where only a minority of the board is sued? Fairly unusual. Almost never happens. So those two other independent trustees, by definition, have no possible potential liability or loss of independence. The other distinguishing factor of this case is the Delaware statute that says that trustees, such as my clients, who are not viewed as insiders under the Investment Company Act, such trustees are independent for all purposes. That's the Delaware Code, Section 3801. So here you have another reinforcing factor to require plaintiffs to make demand, as this court has done many times in derivative cases. The claims here, setting aside this RICO idea that somehow, if Kate Middleton bought a few shares in these companies and came over here on a state visit, she could be arrested, which I think is Mr. Sheridan's theory. But setting aside the RICO claim here, these are standard guard variety breach of fiduciary duty cases. As Mr. Sheridan says, he's already gone ahead in his Vanguard case, the case the Second Circuit affirmed the dismissal in. He's already gone ahead and filed that case in state court in Delaware where the demand issue is being litigated. So this is a classic demand requirement, and I would urge the court to affirm on that alternative ground should it choose to do so. Mr. Spiegel, thank you very much. Thank you. Mr. Sheridan, back to you. You've got about a minute left or so. I know my time had to last, but I would be- You've got a minute. Okay. Two points. The Diaz case and the Mendoza case are still good law. They've survived HEMI without any impairment, and if you look at this court's consistent decisions, the court has repeatedly said you have to decide RICO proximate cause issues on the basis of the three non-exhaustive factors. The court below didn't do that. If this court does do that, I think it leads inexorably to the result that proximate cause here is satisfied. The other argument about ownership of stock, I don't see how you can own all or part of a corporation without owning the stock. That's how you own a corporation. You own its stock. The fact that the mutual fund does not own the personal property of the corporation is completely irrelevant. If some gangster set up a corporation to engage in illegal gambling and he owned that stock, he'd be guilty of violating the statute. And whether or not he acted passively or not doesn't matter because ownership is an inherently passive activity. Congress wanted to get at the passive in who owns the company as well as the underlings who roll the dice or run the slot machines or whatever. Thank you very much. Thank you. Gentlemen, thank you too. The case just argued is submitted. Good morning. Marciano v. White in United States v. Sierro are submitted on the briefs at this time.
judges: Silverman, Tallman, Clifton